UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

JEANETTE JONES,                                    :

                              Plaintiff,           :

              - against -                          :

MICHAEL J. ASTRUE,                                 :
Commissioner of Social Security,

                                                   :

                              Defendant.

---------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____            │
│ DATE FILED: 07/15/2011____           │
└─────────────────────────────────────┘
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
DEBORAH A. BATTS**

09 Civ. 5577 (DAB) (FM)

**FRANK MAAS**, United States Magistrate Judge.

                    Plaintiff Jeanette Jones ("Jones") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner")

denying her application for disability insurance benefits.  The Commissioner has moved,

and Jones has cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure ("Rule 12(c)").  For the reasons set forth below, I

recommend that (a) Jones' motion be granted in part, (b) the Commissioner's motion be

denied, and (c) the case be remanded for further consideration of the credibility of Jones'

complaints regarding the intensity, persistence, and limiting effects of her symptoms.

I.       Background and Procedural History

On October 14, 1997, Jones filed an application for disability insurance

benefits, alleging that her disability began on September 1, 1995.  (See Tr. 67-68).[1]

Jones claimed that she was disabled because obesity and severe arthritis in her hands and

knees rendered her unable to work.  (Id. at 68).  After the Social Security Administration

("SSA") denied Jones' application based on a state agency review, she requested a de

novo hearing before an administrative law judge ("ALJ").  (Id. at 78-83, 90-92).

ALJ Jonathan Jacobs held a hearing on May 22, 2001, at which Jones

testified without a representative.  (Id. at 51-64).  ALJ Jacobs issued a decision on June

12, 2001, in which he concluded that Jones was not disabled within the meaning of the

Act, much less disabled before December 31, 1999, the date when her disability benefits

expired.  (Id. at 67-72 (finding that Jones could perform sedentary work)).  Jones received

a copy of ALJ Jacobs' decision the month after it was issued and requested review of the

decision by letter dated September 6, 2001.  (Id. at 123).  Having received no response

from the Appeals Council or the Office of Hearings and Appeals, Jones eventually

obtained counsel and made a further request for review by letter dated June 21, 2005.[2]

(Id. at 120-21).  On December 19, 2006, the Appeals Council denied Jones' request for

_____

[1]       Citations to "Tr." refer to the certified copy of the administrative record filed with
the Answer.  (ECF No. 4).

[2]       In 2005, Jones applied for, and began receiving, Supplemental Social Security
Income ("SSI") under Title XVI of the Act.  She was awarded SSI benefits from January 1,
2005, based on an application filed on January 14, 2005.  (Tr. 7, 116).

review because she had not filed it within sixty days after the date she received the decision, as required by 20 C.F.R. § 404.968(a).  (Id. at 115-17).

Jones commenced an action in this Court on January 18, 2007, challenging the Appeals Council's denial of her request for review of ALJ Jacobs' decision.  (Id. at 102).  On December 18, 2007, then-District Judge Chin denied the Commissioner's motion to dismiss and remanded the matter for a "hearing to determine the timeliness of [Jones'] request for review."  Jones v. Astrue, 526 F. Supp. 2d 455, 457 (S.D.N.Y. 2007); (Tr. 100-09).  Subsequently, on April 10, 2008, the Appeals Council found that Jones had good cause for her untimely filing and remanded the case for further proceedings.  (Tr. 47-50).

On remand, ALJ Robin Arzt held a supplemental hearing on March 30, 2009, at which Jones was represented by Carolyn A. Kubitschek, Esq., who also represents her before this Court.  (Id. at 750-90).  At the hearing, Jones amended her disability onset date from September 1, 1995 to October 8, 1999, the date that she began to receive psychological counseling at a clinic.  (Id. at 7, 757).  Jones conceded that her physical impairments, "[i]n and of themselves," were not disabling as of her amended onset date; ALJ Arzt therefore considered only whether Jones' mental impairment was disabling.  (Id. at 7, 757, 782-88).  ALJ Arzt issued a decision on May 13, 2009, in which she concluded that Jones was not disabled within the meaning of the Act before December 31, 1999, the date she last was insured for disability benefits.  (Id. at 4-15).

This decision became final when Jones declined to file objections with the Appeals Council.  (See ECF No. 1 ("Compl.") ¶ 13).

Jones timely commenced this action on June 17, 2009.  (ECF No. 1).  The Commissioner filed his answer on October 21, 2009.  (ECF No. 4).  On December 8, 2009, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c).  (ECF Nos. 6, 7).  Jones filed a cross-motion for judgment on the pleadings, in which she also opposed the Commissioner's motion, on January 11, 2010.  (ECF Nos. 8, 9).  Thereafter, on February 17, 2010, the Commissioner filed his reply memorandum.  (ECF No. 10).  Both motions consequently are fully submitted.

On June 4, 2010, after the case was reassigned to Your Honor, it was referred to me for a Report and Recommendation.  (ECF No. 12).  The issue presented by both motions is whether the ALJ's determination that Jones was not disabled within the meaning of the Act is legally correct and supported by substantial evidence.

II.   Relevant Facts

A.   Nonmedical Evidence

Jones was born on February 9, 1956, in Copenhagen, Denmark.  After moving several times throughout Europe during her childhood, she settled in the United States with her mother and siblings at the age of eleven.  (Tr. 374, 537, 758).  She was 43 years old on October 8, 1999, the alleged onset date, and 53 years old at the time of the hearing before ALJ Arzt in 2009.

In her childhood, Jones lived with her mother and six siblings.  (Id. at 375). When she was six years old, her step-father sexually abused her.  (Id.)  Jones attended school through the tenth grade and eventually obtained a general equivalency degree ("GED").  She attended a two-year training program in Texas to become a licensed practical nurse and worked full time as a nurse in a hospital emergency room and neonatal unit from 1984 to 1990.  (Id. at 62, 759-60).  In 1990, Jones began working as a traveling nurse, fulfilling contracts for nursing services in patients' homes and hospitals in Texas.  She continued this work until 1994, when she relocated from Texas to New York to escape an abusive relationship with her boyfriend.  Upon arriving in New York, she was unable to find employment as a nurse and lived in a shelter for several years.  (Id. at 759-63).  She has not worked since August 1994.  (Id. at 55).

In late 1999, around the time of Jones' alleged onset date, Jones lived in an apartment with her son, who was ten or eleven years old and had been diagnosed with attention deficit hyperactivity disorder ("ADHD").  After the New York City Administration for Children's Services brought charges against Jones' adult daughter, Jones began caring for her daughter's children as well.  Jones' five-year-old granddaughter moved into her apartment in October or November 1999.  In December 2001, Jones' six-week-old grandson began to live with her.  Throughout this time, Jones received help with household chores from volunteers at her church.  At the time of Jones' hearing before ALJ Arzt, both grandchildren still resided with her.  (Id. at 368, 769-72).

Around June 1999, Jones was emotionally and physically abused by the boyfriend from whom she sought to escape from when she left Texas for New York in 1994.  (Id. at 373-74, 774-76).  Jones' family suffered as well:  The former boyfriend raped Jones' adult daughter and threatened to kill Jones and her family.  (Id. at 367, 562; see also ECF No. 9 ("Pl.'s Mem.") at 2).  The New York City Police Department arrested him after he made these threats, but he eventually was released and sent back to Texas. (Tr. 367, 374).  At the recommendation of a counselor from the Manhattan District Attorney's office, Jones sought treatment for her mental problems in October 1999.  (Id. at 371, 766).

B.    Medical Evidence

1.    Mental Impairment

a.    Treating Physician's Records

Jones first received treatment for her mental issues at the Karen Horney Clinic in Manhattan, where she saw Debra Nevas, Ph.D., a psychologist.  (Id. at 367-70). Jones' initial intake interview with Dr. Nevas spanned two days:  October 8, 1999 — the alleged onset date — and October 12, 1999.  A social worker intern at the Karen Horney Clinic conducted subsequent therapy sessions with Jones.  (See id. at 221-37, 372-91).

Dr. Nevas reported that Jones sought therapy because she felt "overwhelmed, fearful and down on herself after being physically and emotionally abused by her boyfriend."  (Id. at 367).  During her intake interview with Dr. Nevas, Jones described her former boyfriend's abuse; she also discussed her son and his difficulties at

school.  Dr. Nevas concluded that Jones showed signs of "depressed mood, lethargy, anhedonia, lack of sleep, impaired concentration, lack of trust, shame, helplessness, anxiety, and self-blame."[3]  (Id.).[4]

As a result of her initial interview, Dr. Nevas concluded that Jones should undergo further evaluation to rule out post-traumatic stress disorder ("PTSD")[5] and cyclothymic disorder.[6]  (Id. at 370).  In her mental status evaluation of Jones, Dr. Nevas found that Jones possessed fair insight, judgment, and impulse control; showed "somewhat" labile affect;[7] spoke with speech that was "somewhat pressured," but normal in tone; exhibited "tangential and vague" thinking; had intact memory, both remote and recent; and possessed at least average intelligence.  (Id. at 369).  Dr. Nevas also assessed

---

[3]      Anhedonia is the "total loss of feeling of pleasure in acts that normally give pleasure."  Dorland's Illustrated Med. Dictionary 92 (31st ed. 2007) [hereinafter Dorland's].

[4]      Dr. Nevas also noted Jones' medical conditions, including her use of a cane.  (Tr. 369).  Jones reported that she had been diagnosed previously with fibromyalgia and had "experienc[ed] physical deterioration in her joints [but was] not certain of the reason."  (Id. at 368).

[5]      "The essential feature of [PTSD] is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 463 (4th ed. 2000) [hereinafter DSM-IV-TR].  "The person's response to the event must involve intense fear, helplessness, or horror."  Id.

[6]      Cyclothymic disorder "is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms . . . and numerous periods of depressive symptoms."  Id. at 398.

[7]      "Labile" refers to "moods or behaviors that are changeable and unstable . . . . Someone who is emotionally labile is capable of switching from anger to sadness to cheeriness rapidly."  Am. Med. Ass'n, Complete Med. Encyclopedia 765 (2003) [hereinafter CME].

how Jones' mental impairment impacted her functioning through the use of the Global

Assessment of Functioning (GAF) scale.[8]  Dr. Nevas concluded that Jones had a GAF

score of 50.  (Id. at 370).  Patients with a score in this range show "[s]erious symptoms"

of mental health illness or experience "serious impairment in social, occupational, or

school functioning."[9]  DSM-IV-TR 34.  Dr. Nevas' notes indicated that Jones'

psychosocial and environmental problems were related to the abuse of her by her former

boyfriend and her inability to work.  (Tr. 370).  Dr. Nevas recommended that Jones

receive mental therapy treatment twice a week for issues related to domestic violence.

(Id.).

                    b.    Social Worker's Records

            After the initial intake interview with Dr. Nevas, Jones met frequently with

Ayelet Nahir-Peleg, a social worker intern,[10] who served as Jones' "primary therapist" at

the Karen Horney Clinic during November and December 1999.  (Id. at 12, 221-25, 372-

90).  During their twice weekly meetings, Jones elaborated on her personal relationships

---

[8]      "The GAF score reflects the patient's current overall occupational, psychological,
and social functioning.  It is not supposed to reflect physical limitations or environmental
problems.  It is recorded as a single number on a 100-point scale. . . . Perhaps because of the
subjectivity inherent in this scale, its greatest usefulness may be in tracking changes in a
patient's level of functioning across time."  James Morrison, DSM-IV Made Easy 7 (1995)
(emphasis omitted).

[9]      Examples of a "serious impairment in social, occupational, or school functioning"
include having "no friends" or being "unable to keep a job."  DSM-IV-TR 34.

[10]     Although ALJ Arzt and the Commissioner both described Nahir-Peleg as a social
worker, (Tr. 12; ECF No. 7 ("Comm'r's Mem.") at 5, 14), she identifies herself as an "SW
intern" or "SWI" in her signed progress notes.  (Tr. 221-37.)

with her children and her former boyfriend and her reasons for seeking therapy.  Nahir-Peleg's records indicate that Jones felt "overwhelmed, disorganized, powerless and out of control over her life."  (Id. at 377).  In particular, Jones discussed her eleven-year-old son's troubles at school and her feelings of "inadequacy" as a mother because she felt unable to help him.  (Id. at 221-22).  Jones expressed concern that her son's school could not meet his needs after he was diagnosed with emotional disturbances and ADHD.  (Id. at 372).  Other issues that Jones and Nahir-Peleg explored included Jones' financial situation and dependence on public assistance; her pending application for Social Security disability benefits and frustration over the lack of a response from SSA; and her medical conditions relating to prior diagnoses of fibromyalgia and possible arthritis.  Despite experiencing pain in her muscles and joints, Jones told Nahir-Peleg that she had not seen a physician in the last six months and was not taking any medications.  Jones blamed herself for the myriad issues that she and her family faced.  (Id. at 221-25, 372-79).

Overall, Nahir-Peleg observed that Jones presented signs of "depressed mood, weight gain, lack of sleep, lack of motivation and low energy."  (Id. at 377).  Nahir-Peleg noted, however, that Jones was "a bright, intelligent and articulate[] woman, who used to be [a] highly functioning person."  (Id.).  In her written treatment plan, Nahir-Peleg outlined several long-term goals for Jones.  These included supporting her family without the help of public assistance, returning to school to become reemployed, and regaining a sense of control over her life.  (Id. at 380).

Jones underwent another mental status examination after a month of therapy sessions with Nahir-Peleg.  (Id. at 376-79).  At that time, Nahir-Peleg observed that Jones related well, maintained good eye contact, and was "active" and "cooperative" during their sessions.  (Id. at 376).  She described Jones' speech as "very articulated," with a "normal rate and tone," although her voice was "somewhat quiet" and she often swallowed her words.  (Id.).  Nahir-Peleg found that Jones's mood was "depressed and irritable."  (Id.).  Jones exhibited an affect that was "usually congruent to mood;" however, sometimes her affect was "somewhat flat."  She had "[n]o delusions, obsessions or fixed ideas," but "constantly blam[ed] herself and criticized herself."  (Id.).  Nahir-Peleg's conclusions regarding Jones' intelligence and memory were consistent with those of Dr. Nevas — i.e., that Jones' intelligence was "average or above" and that she seemed to possess intact memory.  (Id.).  Nevertheless, Jones reported experiencing "blanks" in her memory and having difficulty concentrating.  Nahir-Peleg, like Dr. Nevas, also found that Jones had fair insight, judgment, and impulse control.  (Id. at 376-77).

Nahir-Peleg assessed Jones' GAF score after a few weeks of therapy.  In two separate reports dated December 13, 1999, Nahir-Peleg determined that Jones' score was 45.  (Id. at 372-82).  In a report dated January 7, 2000, which summarized Jones' progress from November 12, 1999 through January 7, 2010, Nahir-Peleg again concluded that Jones' score was 45.  (Id. at 384-86).  In December 1999, Nahir-Peleg diagnosed Jones with PTSD, which she confirmed in January 2000.  (Id. at 378, 381, 385, 389).  An unidentified physician also signed each of these reports.  (Id. at 379, 382, 386, 390).

10

Jones continued to attend therapy sessions at the Karen Horney Clinic until March 2002.  (Id. at 392-424).  Nahir-Peleg served as Jones' therapist until May 5, 2000, after which Ronit Schwab, CSW, treated her.  (Id. at 221-37, 392-415).  The treatment reports from 2000 through early 2002 were consistent with Nahir-Peleg's diagnosis of PTSD.  (Id. at 384-414).

In January 2000, Jones met with Dr. Gillow,[11] a psychiatrist, who prescribed 75 mg of Wellbutrin for her.[12]  (Id. at 226, 385).  A month later, she was prescribed 10 mg of Adderall.[13]  (Id. at 389).  At a subsequent therapy session, Jones indicated that she did not take the prescribed medications.  (Id.).

As of March 30, 2009, the hearing date before ALJ Arzt, Jones was continuing to attend therapy sessions, but at a different clinic.  (Id. at 764).

2.      Physical Impairments

a.      Treating Physicians' Records

Jones first sought medical treatment for pain in her knees and legs in September 1997 at the Hospital for Joint Diseases.  (Id. at 197; see Pl.'s Mem. at 4).  Dr. Javier Beltran, a radiologist at the hospital, concluded that x-rays of Jones' right knee,

---

[11]     Jones' treatment records from the Karen Horney Clinic, which are part of the administrative record, (id. at 221-37, 367-424), do not appear to include any entries by Dr. Gillow.

[12]     Wellbutrin is a drug consisting of bupropion hydrochloride, which is "used as an antidepressant."  Dorland's 265, 2107.

[13]     Adderall is a drug consisting of "amphetamine and dextroamphetamine [that is] used in the treatment of attention-deficit/hyperactivity disorder and narcolepsy."  Id. at 27.

taken on September 5, 1997, disclosed mild osteoarthritis.  Dr. Beltran also observed

"mild degenerative changes involving the lateral compartment" and "minor degenerative

changes of the femoropatellar joints."  (Tr. 211-12).

   On December 12, 1997, Jones saw a physician at the Downtown Family

Care Center, who noted that Jones complained of "arthritis" in her hands and knees,

which she believed was "progressively worsening."  (Id. at 239).  Jones told the doctor

that she experienced a "sharp" pain in her knees and "constant dull ache" in her hands,

both of which increased with activity.  (Id.).  The notes of this visit indicate that Jones'

pain was partially relieved by Ultram[14] and naproxen,[15] as well as physical therapy

sessions at the Hospital for Joint Diseases.  (Id.).  The notes also indicate that Jones was

overweight and had gained sixty pounds over the last three years.  (Id.).

   During this same visit to the Downtown Family Care Center on December

12, 1997, Jones' knees and hands were x-rayed.  Dr. Huyen Cao, who read the x-rays,

found that Jones' left hand and wrists were "unremarkable."  (Id. at 363).  He observed

"normal bone density with no evidence of bone erosion/destruction" and "no evidence of

ligamentous calcification."  (Id.).  Dr. Cao came to the same conclusions with respect to

---

[14] Ultram is a "preparation of tramadol hydrochloride," primarily used to treat
"moderate to moderately severe pain following surgical procedures and oral surgery."  Dorland's
1977, 2027.

[15] Naproxen is "a nonsteroidal antiinflammatory drug . . . used in the treatment of
pain, inflammation, osteoarthritis, [and] rheumatoid arthritis."  Id. at 1251.

Jones' right hand and wrist.  (Id. at 364).  Dr. Cao also read the x-rays of Jones' knees,

observing "mild degenerative changes" as well as bone spurs in both knees.  (Id. at 365-

66).

          In the fall of 1997 and throughout 1998, Jones met regularly with physical

and occupational therapists at the Hospital for Joint Diseases to address the pain in her

knees and hands.  (Id. at 197-98, 202-08).  During these sessions, Jones continued to

complain of pain in her knees, at one point describing the pain as "shooting."  (Id. at 202).

During the same session, her physical therapist noted that Jones was "very slow" to

complete the stretching and strengthening exercises.  (Id.).

          Jones continued to experience pain and undergo testing for her knees in

1998.  (Id. at 257, 358).  On April 23, 1998, Jones had an extensive bone scan.

Consistent with Dr. Cao's diagnosis in December 1997, the radiologist concluded that the

scan showed "probable degenerative changes involving the left knee."  (Id. at 358).

          Jones' progress notes from the Hospital for Joint Diseases show that she

was using knee braces as well as trigger finger and hand splints by October 1998.  (Id. at

204, 210).  Jones also was taking several medications, including Daypro,[16] Ultram, and

amitriptyline[17] to ease her pain.  (Id. at 210).  By the onset date of October 8, 1999, Jones

_____

      [16]     Daypro is a "preparation of oxaprozin," which is "a nonsteroidal
antiinflammatory drug, used in the treatment of rheumatoid arthritis and osteoarthritis."
Dorland's 479, 1376.

      [17]     Amitriptyline is an antidepressant that is also used to treat, inter alia, chronic
pain.  Id. at 64.

walked with the assistance of a cane.  (Id. at 369).  By 2005, Jones used a motorized

scooter to get around.  (Id. at 676).

Jones visited doctors at the Henry Street Settlement several times between

October and December 1999, which is the narrow period between her alleged onset of

disability and the date she last was insured.  (See id. at 712-13).  The administrative

record, however, does not include any detailed medical records for those visits.  (See id.

at 754-55).  In any event, because the pain in Jones' hands and knees did not abate, she

required continuing treatment for several years after her alleged onset date.  (See id. at

582-98 (occupational therapy for hand pain in 2001 and 2002); id. at 629-30 (treatment at

Hospital for Joint Diseases in 2004 for "strong" pain)).  On November 9, 2000,

approximately a year after the alleged onset date, Jones received a diagnosis of mild

bilateral carpal tunnel syndrome from Dr. Aleksander Beric of the Hospital for Joint

Diseases.  (Id. at 315-16).  Dr. Beric confirmed this diagnosis during a follow-up visit on

March 2, 2001.  (Id. at 199).  At that time, Dr. Beric noted that Jones had not received any

medical intervention since her visit in November 2000.  (Id.).

b.    Consulting Physician's Records

Dr. Daoud Karam, a consultative orthopedist, examined Jones on December

17, 1997.[18]  During this visit, Jones reported mild to moderate pain when she moved her

shoulders, wrists, and fingers, as well as pain in her knees and lower back.  Jones used a

---

[18]    The administrative record does not contain Dr. Karam's report.  Accordingly, this
summary is drawn from ALJ Jacobs' decision.

cane and walked with "a mildly stiff gait."  Dr. Karam observed that Jones had difficulty getting up from the chair and the examining table.  X-rays of Jones' hands showed "mild degenerative changes."  Dr. Karam diagnosed Jones with generalized arthritis, opining that Jones "would be limited by joint pain in her ability to stand, walk, lift, carry, push, and pull heavy objects."  (Id. at 69-70).

     C.    Jones' Testimony

     1.    Jones' Testimony Before ALJ Jacobs on May 22, 2001

At the first hearing, held before ALJ Jacobs on May 22, 2001, Jones' testimony focused on her physical impairments.  She explained that she experienced "consistent" pain in her legs, back, and hands.  (Id. at 55-56).  She had been taking glucosamine[19] and Ultram to reduce the pain but was reluctant to take stronger medication that could cause her to become drowsy while caring for her son and grandchildren.  (Id. at 56, 63).  Jones attended physical and occupational therapy sessions and used topical patches and transcutaneous electrical nerve stimulation ("TENS")[20] to alleviate the pain.  (Id. at 56, 58).  She had been fitted for bilateral knee braces and two hand splints prior to the hearing.  She wore the knee braces at the hearing, but her hand splints had recently

---

    [19]    Glucosamine is often used to treat osteoarthritis.  MayoClinic.com, http://www.mayoclinic.com/health/glucosamine/NS_patient-glucosamine (last visited July 12, 2011).

    [20]    TENS therapy alleviates pain by "us[ing] electrical impulses to interfere with pain signals to the brain."  CME 1198.  The patient places small electrodes on the skin where there is pain; a portable generator relays electrical impulses to the electrodes.  Id.  TENS therapy is used to treat, inter alia, back and neck pain, arthritis pain, and fibromyalgia.  Id.

broken, and she was hoping to get replacements.  (Id. at 57-58).  She continued to see doctors at the Downtown Family Care Center, the Downtown New York Hospital, and the Hospital for Joint Diseases.  (Id. at 56-57).

Jones described in detail her difficulties with walking and completing household chores.  She testified that she was unable to walk more than one block before feeling tired, and that she experienced pain when standing for more than fifteen minutes at a time.  Sitting also was difficult for Jones:  she could sit for no more than fifteen to thirty minutes before feeling pain.  Jones estimated that she could lift up to five pounds.  She explained, however, that problems with her hands prevented her from carrying even the lightest objects.  She stated that she would inexplicably lose her grip and suddenly drop things.  Her doctors were still trying to determine the cause of this problem.  (Id. at 58-60).

Completing household chores while withstanding pain was difficult for Jones.  She had received assistance with household chores and grocery shopping from a home attendant, but this service was discontinued before the hearing.  Her thirteen-year-old son helped with chores, and she utilized delivery services for groceries.  Jones testified that she usually spent her days taking care of her son and grandchildren, going to various therapy sessions, attending church services, and reading.  (Id. at 59-60).

Jones testified that she attended mental therapy sessions once each week but used to go to sessions twice each week.  She did not say anything more about her mental limitation or mental therapy sessions.  (Id. at 57).

16

2.      Jones' Testimony Before ALJ Arzt on March 30, 2009

On March 30, 2009, eight years after her hearing before ALJ Jacobs, Jones testified before ALJ Arzt.  (See id. at 750-90).  Jones confirmed during the second hearing that she did not allege a mental impairment when she initially filed her application for disability benefits in 1997; rather, her application alleged physical impairments due to pain in her knees and hands.  (Id. at 765).  Jones conceded, however, that those physical impairments "in and of themselves" were not disabling as of the revised onset date of October 8, 1999.  (Id. at 757).  Through her representative, Jones also agreed that the record was complete, despite the absence of certain medical records from 1999, because they were missing and could not be located by her medical care provider.  (Id. at 754).  Accordingly, the hearing focused primarily on Jones' alleged mental impairment.

Jones' testimony revolved around her physical and emotional abuse by her former boyfriend, who was also the father of her youngest son.  She testified that the abuse began in Texas, where Jones lived before moving to New York in 1994.  There, her boyfriend choked her, "constant[ly] harass[ed]" her, and threatened her and her colleagues.  Jones testified that it was years later that she first realized that she had been the victim of abuse.  Although Jones notified the police and obtained several orders of protection, her boyfriend never was arrested in Texas.  During this period, Jones never attended any mental therapy.  Eventually, she realized that it would be "just better to leave" Texas and move to New York to escape the relationship.  (Id. at 773-75).

In the summer of 1999, Jones' former boyfriend arrived in New York and paid her a visit.  Jones testified that she was reluctant to let him into her apartment, but relented so that he could spend time with their son, who was then ten or eleven years old.  Her former boyfriend slept at a friend's apartment for a few days, after which she allowed him to stay at her apartment so that he and her son could further their relationship.  Although Jones was motivated, in part, by the belief that her former boyfriend was "over" her, he soon started to threaten her and her family, and she feared for the safety of her adult daughter and five-year-old granddaughter.  She described an incident in which her former boyfriend shaved off all of her son's long hair — without her permission or knowledge — simply because he believed that boys should have short hair.  This left her son "devastated."  She commented that it was "embarrassing" to admit how frightened she felt in the presence of her former boyfriend.  (Id. at 775-77).

Jones testified that she called the police who arrested her former boyfriend.  (Id. at 77).  Thereafter, she received mental health counseling at the Karen Horney Clinic beginning in October 1999.  (Id. at 765).  In 1999, as part of her treatment, she took an antidepressant.  (Id. at 772-73).  She believed that she was taking more than one medication at that time but could not recall the total number of drugs or their names.  (Id.).  Jones said that she was continuing to receive therapy as of the hearing date, but now attended a different clinic.  (Id. at 764).

Jones also described the physical impairments that she had in 1999.  According to her testimony, Jones had such difficulty walking that her doctors at the

18

Downtown Family Care Center provided her with full-length, bilateral metal braces for her legs. She also used a cane or a walker. (Id. at 777-78). Despite these assistive devices, Jones experienced days when she "wasn't able to move" and "couldn't get up or anything." (Id. at 767-69).

In addition to pain in her legs, Jones also experienced problems with her hands. She testified that she had trouble maintaining a grip on objects and had lost some sensation in her hands. (Id. at 769). Her doctors were unable to determine the cause of her problem, although they previously believed that she had carpal tunnel syndrome. Jones received splints for her hands sometime in 2000. (Id. at 780-81).

Jones testified that she felt "frustrat[ed]" and "embarrass[ed]" to be on public assistance after years of working, raising children, and living independently. Although she "was trying real hard to get it together," she found it "very frustrating" that her personal and financial situations had not improved. (Id. at 767). Indeed, she was unable to find any job after moving to New York in 1994. She applied for a job retraining program sometime in 1998 but was turned down. (Id. at 760-62, 766).

During her testimony, Jones also described her daily activities during late 1999, around the time of her alleged onset date. She explained that she spent much of her time caring for her son and granddaughter. Her son was then about ten or eleven years old and had problems at school that demanded a significant amount of Jones' time. Classmates often bullied and beat up her son, which required Jones to visit the school. As a result, she spent time speaking with school officials and advocates for children with

special needs to try to find a more suitable school for him.  Jones also attended

occupational and physical therapy to learn how to care for her grandchildren in ways that

would not aggravate the pain in her hands and knees.  She received welcome help with

household chores from friends and volunteers at her church.  (Id. at 770-72).

       D.      <u>ALJ Decision and Appeal</u>

       ALJ Arzt issued a decision on May 13, 2009, in which she concluded that

Jones was not disabled during the relevant period.  (Id. at 4-15).  As an initial matter, ALJ

Arzt noted that, at the hearing, Jones and her representative amended the alleged

disability onset date from September 1, 1995 to October 8, 1999.  (Id. at 7).  They made

this change because the earliest record of her mental impairment was on that date.  (Id.).

The ALJ further explained that Jones' representative had conceded during the hearing that

the record through December 31, 1999, the date Jones last was insured, did not establish a

disabling physical impairment related to either Jones' hands or knees.  (Id.).  Lastly, ALJ

Arzt reiterated Jones' representative's concession that the record was complete for the

period before December 31, 1999, even though one facility — which was unlikely to have

medical treatment records — had not provided records in response to a subpoena.  (Id.).

In light of these changes from the earlier hearing, ALJ Arzt considered only whether

Jones was disabled due to her mental impairments.  (Id.).  The ALJ, however, took into

account Jones' knee impairments when assessing her residual functional capacity

("RFC").  (Id. at 11-13).

Beginning her analysis with Step One of the five-step sequential analysis required by 20 C.F.R. § 404.1520, ALJ Arzt determined that Jones had not engaged in substantial gainful activity during the relevant period.  (Id. at 9).

At Step Two, the ALJ concluded that Jones had "severe impairments" arising from PTSD and osteoarthritis in her knees.  (Id. at 10).  ALJ Arzt did not consider Jones' hand disorder at this step, however, because Jones was unable establish it as "a medically determinable impairment until November 2000," nearly one year after the date last insured.  (Id.).

At Step Three of the analysis, ALJ Arzt found that Jones' medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 ("Appendix 1").  The ALJ reached this conclusion after considering whether Jones' mental impairments, either singly or in combination, met the requirements of either Paragraph B or C of Listing 12.04 of Appendix 1.[21]  (Id.).

Listing 12.04 details the types of affective disorders and level of severity that a claimant must show to prove a mental impairment.  Paragraph B of Listing 12.04 requires that the mental impairments "result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or

---

[21]    The ALJ did not consider whether Jones' mental impairment met the requirements of Paragraph A of Listing 12.04.  (See Tr. 10).

repeated episodes of decompensation, each of extended duration."  (Id.).  The ALJ noted

that a "marked limitation" is defined as one that is "more than moderate but less than

extreme."  Additionally, the phrase "repeated episodes of decompensation, each of

extended duration," requires that the claimant have "three episodes within one year, or an

average of once every four months, each lasting for at least two weeks."  (Id.).

Paragraph C of Listing 12.04 requires that the claimant show a "[m]edically

documented history of a chronic affective disorder of at least two years' duration that has

caused more than a minimal limitation of ability to do basic work activities," plus one of

the following:

> 1.     Repeated episodes of decompensation, each of
>        extended duration; or
>
> 2.     A residual disease process that has resulted in such
>        marginal adjustment that even a minimal increase in
>        mental demands or change in the environment would
>        be predicted to cause the individual to decompensate;
>        or
>
> 3.     Current history of one or more years' inability to
>        function outside a highly supportive living
>        arrangement, with an indication of continued need for
>        such an arrangement.

Appendix 1, Listing 12.04(C).

In determining whether Jones met the criteria of Paragraph B, ALJ Arzt

found that Jones' functional limitations consisted of "mild restriction of activities of daily

living; mild to moderate difficulties in maintaining social functioning; [and] mild to

moderate difficulties in maintaining concentration, persistence or pace."  The ALJ also

found that Jones had "no episodes of decompensation." (Tr. 10). The ALJ concluded

that Jones therefore failed to meet the criteria in Paragraph B because her "mental

impairments did not cause at least two 'marked' limitations or one 'marked' limitation

and 'repeated' episodes of decompensation." (Id.). The ALJ further found that the

evidence also failed to satisfy the criteria of Paragraph C prior to Jones' date last insured.

(Id.).

       Before moving to Step Four, the ALJ noted that the limitations described in

Paragraphs B and C "are used to rate the severity of mental impairments" but do not serve

as an RFC assessment. (Id.). As the ALJ further observed, the mental RFC assessment at

Steps Four and Five requires "a more detailed assessment" involving itemization of the

"various functions contained in the broad categories found in [P]aragraphs B and C."

Accordingly, the ALJ stated that she had "translated" the criteria under Paragraphs B and

C into "work-related functions" as part of her RFC assessment under Steps Four and Five.

(Id.).

       At Step Four of the analysis, ALJ Arzt assessed Jones' RFC and whether

she had the capacity to perform past relevant work. (Id. at 11-14). The ALJ found that

Jones could perform light work because she had the capacity to "occasionally lift and

carry up to twenty pounds at a time, frequently lift and carry up to ten pounds at a time,

walk and stand up to six hours out of an eight hour day, push and pull light weight

objects, and occasionally bend and stoop." (Id. at 11). The ALJ also found that Jones

had the mental ability to perform unskilled work because she "retained the ability to

understand, remember and carry out simple instructions, make judgments on simple work-related decisions, respond appropriately to coworkers and supervisors, and deal appropriately with usual work situations and changes in a routine work setting."  (Id.).

        In reaching these conclusions, ALJ Arzt reviewed Jones' nonmedical and medical history, including her hearing testimony.  (Id. at 12-14).  The ALJ found that Jones' "medically determinable impairments reasonably could be expected to produce some of the alleged symptoms and limitations."  (Id. at 12).  The ALJ, however, went on to say that the record did "not entirely support[]" Jones' "statements concerning the intensity, persistence and limiting effects of these symptoms and limitations."  (Id.).  ALJ Arzt noted that Jones saw a psychologist once in October 1999 and thereafter received mental therapy treatment from social workers.  (Id.).  Her therapist's quarterly treatment review plans, dated January 2000 and April 2000, found that Jones was "engaged in the treatment" and was "highly intelligent and insightful."  (Id.).  The ALJ emphasized that, during the therapy sessions, Jones "reported feeling 'occasionally overwhelmed, anxious,'" and "'tired of being tired' from daily problems."  (Id.).  The ALJ concluded that Jones' mental status examination, conducted by her psychologist in October 1999, "suggest[ed] no more than moderate limits" because Jones' "attention, cognition, and recent and remote memory were intact."  (Id.).  Without elaborating on her reasoning, the ALJ also observed that Jones' testimony regarding her "activities during late 1999 suggest[ed] an even better level of day-to-day mental functioning than [was] indicated in the Karen Horney Clinic records."  (Id.).

24

As part of her Step Four analysis, the ALJ also reviewed Jones' medical records regarding her knees.  (<u>Id.</u> at 13).  The ALJ summarized Jones' medical records from 1997 and 1998, noting that Jones was diagnosed with osteoarthritis and degenerative disease of the knees.  The ALJ twice observed, however, that "[t]here are no records of any care taking place during 1999."  (<u>Id.</u>).  Emphasizing that Jones' medical records after the date last insured were irrelevant, the ALJ found that "there is minimal to mild evidence of any significant orthopedic impairments [of the knees] by the [date last insured]."  (<u>Id.</u>).  ALJ Arzt further found "no objective medical evidence" of a hand impairment during the relevant period.  (<u>Id.</u>).  "Giving [Jones] the benefit of the doubt that she had limits from the mild knee arthritis," the ALJ concluded that Jones was "unable to do strenuous work."  (<u>Id.</u> at 14).

Under the last part of her analysis at Step Four, ALJ Arzt considered whether Jones was able to perform her past relevant work as a licensed practical nurse.  (<u>Id.</u>).  According to the ALJ, as Jones performed it, this job entailed "skilled, exertionally medium work," which is consistent with the job description in the Department of Labor's <u>Dictionary of Occupational Titles</u>.  (<u>Id.</u>).  ALJ Arzt concluded that Jones "was unable to perform her past relevant work because it was beyond her residual functional capacity."  (<u>Id.</u>).

Moving to Step Five, the last step of the analysis, the ALJ considered whether Jones could make an adjustment to other work based on her RFC, age, education, and work experience.  (<u>Id.</u>).  The ALJ considered these factors in conjunction with the

Medical-Vocational Guidelines ("Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2 ("Appendix 2"), which serve as a "framework" for determining whether a claimant with a nonexertional limitation is disabled.[22]  (Tr. 14-15).

ALJ Arzt found that Jones was 43 years old on the date last insured, had a GED, and could speak and write English.  (Id. at 14).  Because the ALJ determined that Jones had the RFC for light work at Step Four, the ALJ evidently located Jones' "specific vocational profile" in Rule 202.21 of the Grids, which applies to a claimant who is (1) a younger individual between 18 and 44 years of age; (2) a graduate of high school; (3) skilled or semiskilled through previous work experience; and (4) limited to light work as a result of severe medically determinable impairment(s).  (See id. (citing Appendix 2)). This rule in the Grids calls for a determination of no disability for a claimant with Jones' specific vocational profile.  After acknowledging that the Grids serve as "a framework for decisionmaking," the ALJ adopted the Grids' conclusion because Jones' "nonexertional mental limitations d[id] not significantly diminish the exertionally possible range of work."  (Id. at 15).  As an aside, the ALJ noted that whether Jones' skills could be transferred to a different field is immaterial because Rule 202.21 results in a finding of no

---

[22]     The Grids are a "series of rules that can direct an ALJ to conclude that a claimant is either 'disabled' or 'not disabled' depending upon the claimant's age, residual functional capacity, and vocational profile."  Whitfield v. Astrue, No. 08 Civ. 6427 (MAT), 2010 WL 2925962, at *2 n.3 (W.D.N.Y. July 23, 2010).  "Where a claimant only suffers from exertional impairments, the [G]rids are conclusive of the existence of a disability; where, however, a claimant suffers from additional 'nonexertional' impairments, the [G]rid rules may not be controlling."  Comerota v. Astrue, No. 07 Civ. 175 (LEK), 2011 WL 940306, at *9 (N.D.N.Y. Mar. 16, 2011) (internal quotation marks omitted).

disability, regardless of whether a claimant with Jones' vocational profile possessed transferable skills.  (Id. at 14).

Prior to completing Step Five of her analysis, ALJ Arzt did not obtain testimony from a vocational expert, nor did she rely on any vocational resources other than the Grids.  Without identifying specific jobs that Jones could perform, the ALJ concluded that "there were jobs that existed in significant numbers in the national economy that [Jones] could have performed based upon [Rule 202.21 of the Grids]." (Id.).

III.    Applicable Law

A.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

27

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, when the Commissioner's determination is supported by substantial evidence, the decision must be upheld. See Alston v. Sullivan, 904 F.2d 122, 128 (2d Cir. 1990). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant had a full hearing." Rocchio v. Astrue, No. 08 Civ. 3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)), report and recommendation adopted by 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). This requires the ALJ to develop the record fully, a duty which attaches even when the claimant is represented by counsel. Id.

B.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

28

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527(e)).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. § 404.1520.  The Second Circuit has

described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him disabled without considering vocational
> factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform
> his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The five-step process applies to the evaluation of both physical and mental

impairments.  20 C.F.R. § 404.1520a(a).  However, when a claimant's application for

disability is based on a mental impairment, the Commissioner must also apply a "special

technique" at Steps Two and Three and document its application.  Id.; Kohler v. Astrue,

546 F.3d 260, 265-66 (2d Cir. 2008).  If the Commissioner finds that the claimant has a

"medically determinable mental impairment(s)" at Step Two, the Commissioner "must

specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree to which the claimant's impairment functionally limits her "ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 404.1520a(c)(2). To complete this assessment, the Commissioner "rate[s] the degree of [the claimant's] functional limitation" in four functional areas: (1) "[a]ctivities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation." Id. § 404.1520a(c)(3). For the first three functional areas, the Commissioner provides a rating of either "[n]one, mild, moderate, marked, [or] extreme." Id. § 404.1520a(c)(4). For the fourth category — episodes of decompensation — the Commissioner provides a rating on a four-point scale: "[n]one, one or two, three, four or more." Id.

The Commissioner uses these ratings to determine the severity of the claimant's mental impairment. Id. § 404.1520a(d). Generally, the Commissioner will conclude that the claimant's mental impairment is not severe if the claimant receives a rating of "none" or "mild" in each of the first three areas and "none" in the fourth area. Id. § 404.1520a(d)(1); Kohler, 546 F.3d at 266. If the ratings indicate that the claimant suffers from a severe impairment, the Commissioner proceeds to Step Three, where he must "determine if [the impairment] meets or is equivalent in severity to a listed mental disorder" in Appendix 1. 20 C.F.R. § 404.1520a(d)(2). If the claimant's impairment "meets or is equivalent in severity to a listed mental disorder," the Commissioner will

conclude that the claimant is disabled.  Id.; Kohler, 546 F.3d at 266.  If not, the

Commissioner must move to Step Four to assess the claimant's residual functional

capacity as outlined in 20 C.F.R. § 404.1520(a)(4)(iv).  Id. § 404.1520a(d)(3).

      The claimant bears the burden of proof with respect to the first four steps of

the five-step process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  However, if the

analysis reaches the fifth step of the process, the burden shifts to the Commissioner to

show that the claimant is capable of performing other work.  DeChirico, 134 F.3d at

1180.

      In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or

other[s]; and (4) the claimant's educational background, age, and work experience."

Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

      C.    Opinion of Treating Physician

      Pursuant to SSA regulations, the ALJ is required to give controlling weight

to a treating physician's opinion "when the opinion is 'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence'" in the record.  Colondres v. Barnhart, No. 04 Civ. 1841

31

(SAS), 2005 WL 106893, at *6 (S.D.N.Y. Jan. 18, 2005) (quoting 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2)).  The regulations further mandate that if controlling

weight is not given to the treating physician's opinion, the ALJ <u>must</u> consider a series of

factors in determining the proper weight to give to that opinion.  <u>Id.</u>  Those factors

include "(i) the frequency of examination and the length, nature, and extent of the

treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

consistency with the record as a whole; and (iv) whether the opinion is from a specialist."

<u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000) (quoting <u>Clark v. Comm'r of Soc. Sec.</u>,

143 F.3d 115, 118 (2d Cir. 1998)); <u>see</u> 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-

(6).  The ALJ is further required to explain and provide "good reasons" for the failure to

credit the treating physician's opinion.  <u>Id.</u> §§ 404.1527(d)(2), 416.927(d)(2) ("We will

always give good reasons in our notice of determination or decision for the weight we

give your treating source's opinion.").

   If the ALJ fails to apply the correct standard in weighing a treating

physician's opinion or fails to give good reasons for rejecting the opinion, a remand for

further fact finding is the appropriate remedy.  <u>Halloran</u>, 362 F.3d at 33; <u>Dudelson v.</u>

<u>Barnhart</u>, No. 03 Civ. 7734 (RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10,

2005) (citing <u>Schaal</u>, 134 F.3d at 506).

IV. <u>Application of Law to Facts</u>

   The issues presented by the cross-motions are whether the Commissioner

correctly applied the law and whether substantial evidence exists to support his findings.

Jones contends that the Commissioner's decision was improper because the ALJ violated the treating physician rule, failed to apply the "special technique" required for evaluation of mental impairments, failed to assess properly Jones' credibility and subjective statements regarding pain, and failed to sustain the Commissioner's burden at Step Five of the analysis.  (Pl.'s Mem. at 13-20).  The Commissioner disputes these assertions, maintaining that substantial evidence supports the decision that Jones was not disabled, and that the ALJ's analysis at Step Five was proper.  (Comm'r's Mem. at 10-17; ECF No. 10 ("Comm'r's Reply Mem.") at 1-7).

As set forth below, the ALJ properly applied the treating physician rule and the special technique for assessing mental impairments.  There also is substantial evidence to support the ALJ's findings at the first three steps of the sequential evaluation. At Step Four, however, the ALJ's findings are insufficient.  Accordingly, despite the length of time that Jones has been seeking disability insurance benefits, the case must be remanded to permit the Commissioner to explain further his determinations with respect to the credibility of Jones' testimony.

A.    Treating Physician

Jones contends that the ALJ violated the treating physician rule by failing to "afford controlling weight to the uncontradicted opinion of Dr. Nevas," the psychologist who initially interviewed Jones at the Karen Horney Clinic in October 1999.  (Pl.'s Mem. at 8).  Jones asserts that the ALJ was bound by Dr. Nevas' "repeated[]" conclusions that Jones' "[PTSD] was in itself disabling."  (Id. at 7).  More specifically, Jones argues that

her GAF score, which ranged from 45 to 50 during the relevant period, establishes that she was "unable to work." (Id. at 7-8; see Tr. 370, 379, 386). In making this claim, Jones relies on the GAF scale in DSM-IV-TR, which states that individuals with scores of 41 to 50 have either "serious symptoms," such as suicidal ideation, or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR 34; (see Pl.'s Mem. at 8). Jones further contends that the ALJ improperly substituted her opinion for that of a physician at Step Four of the analysis. (Pl.'s Mem. at 9-10).

In response, the Commissioner asserts that Jones' GAF score is not the same as an opinion from Jones' psychologist that she is disabled, and, accordingly, is entitled to no weight. (Comm'r's Reply Mem. at 2-4). The Commissioner also maintains that only the Commissioner may determine whether a claimant is disabled or unable to work. (Id. at 3).

While it is true that Dr. Nevas' opinion about Jones' mental impairments was fairly consistent with other therapy reports in the record, the ALJ afforded Dr. Nevas' opinion proper weight. The ALJ gave controlling weight to a mental status examination performed by Dr. Nevas that indicated that Jones' "attention, cognition, and recent and remote memory were intact." (Tr. 12). Furthermore, the ALJ gave proper weight to the opinions and diagnoses of Nahir-Peleg, Jones' primary therapist throughout the period at issue. The ALJ cited to Nahir-Peleg's observations that Jones was "engaged in the treatment" and "highly intelligent and insightful." (Id.). Even though Nahir-Peleg, who

34

was not a licensed or certified psychologist, diagnosed Jones with PTSD, the ALJ

concluded that this diagnosis was medically established.  (Id. at 10).  Indeed, because of

her regular treatment relationship with Jones, the ALJ properly gave Nahir-Peleg's

opinions considerable weight.  See White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170,

176 (W.D.N.Y. 2004) (social worker, as the only source who maintained "a regular

treatment relationship" with claimant, deserved more than "little weight"); 20 C.F.R.

§ 404.1513(d) (therapists considered "other" nonmedical source for establishing

claimant's impairment).

           To the extent that Dr. Nevas or Nahir-Peleg made a determination that

Jones was disabled or unable to work, the Commissioner clearly was not bound.  The

SSA regulations are abundantly clear that only the Commissioner may determine whether

a claimant is disabled or unable to work.  20 C.F.R. § 404.1527(e).  Thus, a determination

of disability is an "administrative finding" "reserved to the Commissioner," and a

"statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does

not mean that [the Commissioner] will determine that [the claimant is] disabled."  Id.; see

also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement

that the claimant is disabled cannot itself be determinative.").

           Jones asserts that she was disabled simply because a person with her GAF

score might be unable to work according to the scale in DSM-IV-TR.  There is no

indication in the therapy records, however, that Dr. Nevas or Nahir-Peleg considered

Jones unable to work based on her GAF score or otherwise.  Indeed, one of Jones' long-

35

Case 1:09-cv-05577-DAB-FM   Document 13   Filed 07/15/11   Page 36 of 54

term goals during this time was to become reemployed. (Tr. 380). There is no suggestion in the records that Dr. Nevas or Nahir-Peleg considered that an unrealistic goal. In any event, even if Jones' therapists believed that Jones was disabled or unable to work, it was proper for the ALJ to make her own disability determination. 20 C.F.R. § 404.1527(e). Thus, any inference derived from Jones' GAF score that she was disabled within the meaning of the Act did not bind the ALJ.

Jones' last argument with respect to the treating physician rule is that ALJ Arzt improperly substituted her own opinion for that of a physician. In particular, Jones focuses on the ALJ's observation, at Step Four of the analysis, that Jones' "testimony about her activities during late 1999 suggests an even better level of day-to-day mental functioning than [was] indicated in the Karen Horney Clinic records." (Tr. 12). Because the ALJ failed to elaborate on this statement, it is difficult to ascertain exactly which activities indicated a "better" level of mental functioning. (Id. at 11-13). At the very least, however, the ALJ did not substitute her own diagnosis for that of Jones' physician or therapist when making this statement. Cf. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (improper for ALJ, without citing to medical opinions in the record, to conclude that claimant had no muscle atrophy). ALJ Arzt never outrightly rejected the opinions of Jones' psychologist and therapist; rather, the ALJ discussed the records from Jones' psychologist and therapist and accepted their diagnosis of PTSD. (Tr. 10-12). Thus, the ALJ did not "substitute [her] own expertise or view of the medical proof for the treating

physician's opinion."  <u>Shaw</u>, 221 F.3d at 134.  Instead, the ALJ merely noted slight

inconsistencies between Jones' testimony and the mental therapy records from late 1999.

      ALJ Arzt therefore did not violate the treating physician rule.

      B.     <u>"Special Technique" for Evaluation of Mental Impairments</u>

      Jones contends that ALJ Arzt failed to properly assess her mental

impairment under the "special technique" for evaluation of mental impairments, 20

C.F.R. § 404.1520a.  (Pl.'s Mem. at 12).  More specifically, Jones asserts that the

regulations required ALJ Arzt to complete a Psychiatric Review Technique Form

("PRTF"), and that her failure to do so was reversible error.  (<u>Id.</u>).

      The "special technique" for the evaluation of mental impairments requires

that the reviewing authority — here, the ALJ — make additional findings at Steps Two

and Three when a claimant applies for disability based on a mental impairment.  20

C.F.R. § 404.1520a; <u>Kohler</u>, 546 F.3d at 265-66.  At the initial and reconsideration levels

of review, the medical or psychological consultant often will complete a PRTF, which

serves as a "simple and convenient method of documenting" the consultant's conclusions.

<u>Revised Medical Criteria for Evaluating Mental Disorders & Traumatic Brain Injury</u>, 65

Fed. Reg. 50,746, 50,757 (Aug. 21, 2000); 20 C.F.R. § 404.1520a(e)(1); <u>see also</u> <u>Kohler</u>,

546 F.3d at 266 (describing regulations).  The regulations, however, do not require the

<u>ALJ</u> to complete a PRTF for every claimant with a mental impairment because the

additional documentation would be "redundant" in light of other regulations applicable at

the ALJ-review level.  <u>Revised Medical Criteria for Evaluating Mental Disorders &</u>

Traumatic Brain Injury, 65 Fed. Reg. at 50,757-58 (ALJ must provide a "detailed explanation of the findings and conclusions reached, supported by a narrative rationale").

Nothing in the SSA regulations requires an ALJ to complete a PRTF. Indeed, the SSA has indicated that it would be "redundant" for the ALJ to complete a PRTF every time a claimant alleged a mental impairment. Id. Thus, ALJ Arzt's decision to forgo completion of a PRTF when evaluating Jones' mental impairment was plainly proper and not reversible error.

Moreover, ALJ Arzt properly applied the special technique at Steps Two and Three and made the required findings that the regulation demands. (See Tr. 10). ALJ Arzt rated Jones' degree of functional limitation for each of the four categories delineated in 20 C.F.R. § 404.1520a(c)(3). The ALJ concluded that Jones' mental impairment limited her functioning in that she had: "mild restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation." (Id.). Thus, ALJ Arzt's evaluation of Jones' mental impairment satisfied the requirement that she make specific findings and adequately document Jones' degree of mental impairment. See 20 C.F.R. § 404.1520a(e)(2).

C.    Substantial Evidence

The remaining question is whether the ALJ's decision is supported by substantial evidence and accords with the applicable law.

1.      First Step

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(1).  In that regard, the ALJ determined that Jones had not engaged in substantial gainful activity since the alleged onset of her disability.  (Tr. 9). This finding benefits Jones and is consistent with the evidence, which indicates that Jones was employed as a licensed practical nurse from 1984 to 1994, but had not worked since then.  (Id. at 373-74, 760).

2.      Second Step

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Id. § 404.1520(c).  The ALJ does not consider the claimant's age, education, or work experience at this step.  Id.

The ALJ determined that Jones' PTSD and the osteoarthritis in her knees were both severe impairments.  (Tr. 10).  Indeed, the medical records confirm that Dr. Nevas, Jones' psychologist, believed that Jones might be suffering from PTSD due to the mental and physical abuse she experienced.  (Id. at 370).  After several therapy sessions, Nahir-Peleg, a social worker intern, diagnosed Jones with PTSD.  (Id. at 378).  There thus is substantial evidence in the record supporting the ALJ's finding that Jones' mental impairment was severe.

With respect to Jones' knee disorder, the record supports the ALJ's finding that Jones' osteoarthritis was a severe impairment.  Jones' x-rays and bone scans revealed degenerative changes and "mild osteoarthritis."  (Id. at 211-12, 358, 365-66).  Throughout 1997 and 1998, Jones reported that she had pain in her knees and sought out physical and occupational therapy to cope with the pain.  (Id. at 197-98, 202-08, 239).  Jones also took several medications to alleviate the pain, including Ultram, Daypro, and naproxen.  (Id. at 210, 239).  There consequently is substantial evidence to support the ALJ's finding that Jones' bilateral knee disorder was a severe impairment within the meaning of the Act.

The ALJ, however, did not consider Jones' hand disorder as part of her analysis at Step Two.  (Id. at 10).  Although Jones reported pain in her hands prior to her alleged onset date, (id. at 239), without some objective evidence, that showing alone was not sufficient to establish a medically-determinable hand impairment.  See SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996) (requiring "medical signs and laboratory findings [to] demonstrat[e] the existence of a medically determinable physical or mental impairment(s)" regardless of the "genuine[ness]" of the claimant's complaints).  Jones did not receive a diagnosis of mild carpal tunnel syndrome until November 2000, nearly one year after the date last insured.  (Tr. 10, 315-16).  Because the record does not establish a "medically determinable [hand] impairment" during the period at issue — October 8 to December 31, 1999 — ALJ Arzt properly disregarded Jones' hand disorder at Step Two.

In any event, the ALJ found two severe impairments, which required her to proceed to Step Three of the analysis.

40

3.     Third Step

The third step calls for the ALJ to determine whether the claimant has an impairment listed in Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ is required to base this determination solely on medical evidence, without regard to the claimant's age, education, or work experience.  Id. § 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or equals a listing in Appendix 1, the claimant is considered disabled within the meaning of the Act.  Id. §§ 404.1520(a)(4)(iii), (d).

Jones' mental impairment had to be evaluated under Section 12.04 of Appendix 1, which pertains to "[a]ffective [d]isorders" that are "[c]haracterized by a disturbance of mood."  Appendix 1 § 12.04.  To meet this listing, a claimant must fulfill the requirements of Paragraphs A and B or Paragraph C.  Id.  Paragraph A requires "[m]edically documented persistence, either continuous or intermittent, of one of the following:  (1) [d]epressive syndrome . . . ; (2) [m]anic syndrome . . . ; [o]r (3) [b]ipolar syndrome."  Id. § 12.04(A).  Under Paragraph B, the claimant's impairment must "result[] in at least two of the following:  (1) [m]arked restriction of activities of daily living; or (2) [m]arked difficulties in maintaining social functioning; or (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) [r]epeated episodes of decompensation, each of extended duration."  Id. § 12.04(B).  Under Paragraph C, the claimant must have a "[m]edically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities."  Id. § 12.04(C).  To satisfy Paragraph C, the claimant must also

show one of the following:  (1) "[r]epeated episodes of decompensation;" (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) "[c]urrent history of one or more years' inability to function outside a highly supportive living arrangement."  Id. § 12.04(C).  The ALJ found that Jones did not have an impairment under either Paragraph B or C, but did not consider whether Jones met the criteria of Paragraph A.[23]  (Tr. 10).

ALJ Arzt concluded that Jones did not meet the requirements of Paragraph B because her mental impairment did not result in either two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation.  (Id.).  She found instead that Jones' mental impairment resulted in the following limitations:  "mild restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation."  (Id.).

---

[23]      Nonetheless, the record contains substantial evidence that Jones' signs, symptoms, and diagnosis of PTSD satisfied the criteria of Paragraph A for "depressive syndrome."  (See Tr. 367-414).  As noted above, after an initial interview with Jones, her psychologist sought to rule out PTSD.  (Id. at 370).  After several subsequent therapy sessions, a social worker intern, who served as Jones' primary therapist, diagnosed Jones with PTSD in December 1999.  (Id. at 378).  There also is additional evidence, from the records of Jones' psychologist and therapist, indicating that she experienced recent weight gain, low-energy, feelings of self-blame, anhedonia, and depressed mood.  (Id. at 368, 376-77).

Substantial evidence supports the ALJ's findings with respect to the four categories in Paragraph B.  In the first category, activities of daily living,[24] the ALJ's finding that Jones suffered a "mild restriction" is supported by Jones' testimony and therapy records.  Jones testified that she experienced difficulty completing household chores and received help from volunteers at her church.  However, during this time, she was capable of completing other activities of daily living; among other things, she was the sole caretaker of her son and granddaughter, and she spent significant time interceding on her son's behalf at school.  She also took public transportation to mental therapy sessions.  (Id. at 221, 770-72).

The record also supports ALJ Arzt's finding that Jones experienced "mild to moderate difficulties in maintaining social functioning," the second category in Paragraph B.[25]   (Id. at 10).  Among the facts suggesting only a mild impairment was Jones' ability to interact with school officials to find a suitable school for her son.  Jones also had friends from church who volunteered to help with household tasks.  Despite these positive attributes, Jones' therapy records show that she often felt isolated and detached from family and friends.  She also was fearful, especially after her former

---

[24]      "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Appendix 1 § 12.00(C)(1).

[25]      "Social functioning refers to [the claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals."  Appendix 1 § 12.00(C)(2).

boyfriend abused and threatened her.  (Id. at 372-77, 772).  In these circumstances, a finding of mild to moderate impairment of social functioning was fully justified.

Jones' therapy records also provide substantial evidence for the ALJ's finding, under the third category in Paragraph B, that Jones suffered "mild to moderate difficulties in maintaining concentration, persistence or pace."[26]  (Id. at 10).  Both Jones' psychologist and therapist observed that Jones had "intact" recent and remote memory.  (Id. at 369, 376).  Jones told her therapist, however, that she had "'blanks' in her memory regarding certain events and times."  (Id. at 376).  Her psychologist and therapist also noted that Jones' thought process was "tangential and vague."  (Id. at 369, 376).

Finally, the record supports ALJ Arzt's finding that Jones suffered no episodes of decompensation, the last category in Paragraph B.[27]  During the relevant period, Jones attended weekly, and sometimes twice weekly, mental therapy sessions.  (Id. at 221-37).  Despite extensive treatment notes, there is no indication that Jones experienced "exacerbations or temporary increases in symptoms or signs" of PTSD.  Appendix 1 § 12.00(C)(4).  Nor does Jones' history of medication, including her

---

[26]    "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  Appendix 1 § 12.00(C)(3).

[27]    "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. . . . Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household)."  Appendix 1 § 12.00(C)(4).

prescriptions for Adderall and Wellbutrin, (id. at 385, 389), suggest that she suffered an episode of decompensation.  In fact, she often failed to take her prescribed medications, yet was able to function without them.  (Id. at 389).

The record also provides substantial support for ALJ Arzt's conclusion that Jones did not meet the criteria of Paragraph C.  (Id. at 10).  During the relevant period of October to December 1999, Jones was diagnosed, for the first time, with PTSD.  (See id. at 378, 381, 385).  At that time, however, she did not have a documented medical history of PTSD of two years or greater duration, which Paragraph C requires, Appendix 1 § 12.04(C).  (See Tr. 374 (Jones reported no prior psychiatric history in 1999)).  Nor, as explained above, did Jones suffer from repeated episodes of decompensation.  Indeed, Jones' testimony regarding her daily activities showed that she was able to "function outside a highly supportive living arrangement."  Id. § 12.04(C)(3).

Thus, because none of Jones' impairments met or medically equaled the relevant listings, ALJ Arzt properly continued to the fourth step of the sequential analysis.

4.    Fourth Step

At the fourth step, the ALJ must determine whether the claimant's impairments prevented her from doing her past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f); 404.1560(b)(2).  In doing so, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite any impairments, while considering relevant medical and other evidence from the

case record.  Id. § 404.1545(a)(3).  The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  If the claimant can still perform past relevant work, either as it was performed or as is performed in the general economy, the ALJ must find that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

ALJ Arzt found that Jones had the RFC to "occasionally lift and carry up to twenty pounds at a time, frequently lift and carry up to ten pounds at a time, walk and stand up to six hours out of an eight hour day, push and pull light weight objects, and occasionally bend and stoop."  (Tr. 11).  The ALJ determined that this RFC was consistent with performing light work.  (Id.).  The ALJ further found that Jones was capable of unskilled work because she "retained the ability to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, respond appropriately to coworkers and supervisors, and deal appropriately with usual work situations and changes in a routine work setting."  (Id.).  On the other hand, ALJ Arzt concluded that Jones could not perform her past relevant work as a licensed practical nurse because the work was "beyond her residual functional capacity."  (Id. at 14).

Jones contends that ALJ Arzt "erroneously discounted [her] credibility" by failing to make specific findings regarding her credibility.  (Pl.'s Mem. at 17).  She also contends that the ALJ "erroneously evaluated" her subjective statements regarding pain when they were consistent with the medical evidence.  (Id. at 18-20).  In response, the

Commissioner maintains that the ALJ properly evaluated Jones' complaints of pain and "explained [her] findings" at this step.  (Comm'r's Reply Mem. at 6-7).

The regulations set forth a two-step process to evaluate a claimant's testimony regarding symptoms.  Murphy v. Barnhart, No. 00 Civ. 9621 (JSR) (FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003).  First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant.  Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2); 20 C.F.R. §§ 404.1529(b), 416.929(b).  Then, if the claimant makes statements about her symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1-2.  Such an evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence.  Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [as to claimant's credibility] because [she] heard [claimant's] testimony and observed [her] demeanor.").

In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony.  Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998); SSR 96-7p, 1996

WL 374186, at *4.  The regulations require that the ALJ consider not only the objective

medical evidence, but also the following seven factors:

> [(a) t]he individual's daily activities; [(b) t]he location,
> duration, frequency, and intensity of the individual's pain or
> other symptoms; [(c) f]actors that precipitate and aggravate
> the symptoms; [(d) t]he type, dosage, effectiveness, and side
> effects of any medication the individual takes or has taken to
> alleviate pain or other symptoms; [(e) t]reatment, other than
> medication, the individual receives or has received for relief
> of pain or other symptoms; [(f) a]ny measures other than
> treatment the individual uses or has used to relieve pain or
> other symptoms . . . ; and [(g) a]ny other factors concerning
> the individual's functional limitations and restrictions due to
> pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) (citing 20 C.F.R. §§ 404.1529(c),

416.929(c)); see also Sarchese, 2002 WL 1732802, at *7 (listing factors).  Additionally,

the ALJ may not disregard a claimant's "statements about the intensity and persistence of

pain . . . solely because they are not substantiated by objective medical evidence."  SSR

96-7p, 1996 WL 374186, at *1 (July 2, 1996).

In her decision, ALJ Arzt made, at best, two references to Jones' credibility.

First, the ALJ stated that "[Jones'] medically determinable impairments reasonably could

be expected to produce some of the alleged symptoms and limitations, but that [Jones']

statements concerning the intensity, persistence and limiting effects of these symptoms

and limitations are not entirely supported by the record."  (Tr. 12).  Second, after

summarizing Jones' therapy records, the ALJ wrote that "[Jones'] testimony about her

48

activities during late 1999 suggests an even better level of day-to-day mental functioning

than is indicated in the Karen Horney Clinic records."  (Id.).

        The ALJ's assessment of Jones' credibility was inadequate.  Although ALJ

Arzt provided a summary of Jones' testimony and therapy records, she did not explain

how the record — or even which parts of the record — failed to support Jones' testimony.

ALJ Arzt concluded that Jones' testimony about her symptoms was not supported by

objective medical evidence but the SSA regulations required that she "make a finding on

the credibility of [Jones'] statements."  SSR 96-7p, 1996 WL 374186, at *2 (July 2,

1996).  ALJ Arzt made no such finding in her decision.  Moreover, to the extent that ALJ

Arzt rejected Jones' testimony concerning her symptoms, the regulations precluded her

from doing so "solely because [the testimony was] not substantiated by objective medical

evidence."  Id. at *1.

        Additionally, ALJ Arzt's statement that Jones' testimony suggested a higher

level of mental functioning than her mental therapy records is unacceptably vague.  The

ALJ failed to explain with particularity which activities showed a "better level" of mental

functioning.  (See Tr. 12).  The ALJ also failed to explain why Jones might be credible in

this regard, but potentially incredible when she described her symptoms and limitations.

        Notably, even if there is evidence in the record supporting ALJ Arzt's

conclusion regarding Jones' testimony, this Court may not rely on that evidence if the

ALJ failed to discuss it in her determination.  See Lugo, 20 F. Supp. 2d at 664 ("it is error

to affirm the ALJ's ruling based upon reasoning attributed to her on review but not

identified in her opinion").  Thus, the SSA regulations required ALJ Arzt to "provide her reasoning in a manner that enables this Court to perform effective review."  Id.  The Court is not required to conduct "[its] own search of the record for evidence that might have supported the ALJ's credibility determination;" rather, its review should be based upon reasoning "identified in [the ALJ's] opinion."  Id.

      Unfortunately, because the ALJ's findings with respect to Jones' credibility fail to meet the required level of detail, this Court cannot conduct a meaningful review of her findings at Step Four to determine whether they are supported by substantial evidence.  See Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) ("A finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligent plenary review of the record."); Kleiman v. Barnhart, No. 03 Civ. 6035 (GWG), 2005 WL 820261, at *12 (S.D.N.Y. Apr. 8, 2005) ("[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically.").  Accordingly, despite its age, this case must be remanded so that the ALJ can provide a more detailed explanation of the reasons underlying her credibility determination, consistent with the requirements of 20 C.F.R. § 404.1529.

      5.    Fifth Step

      Because the Court must remand this case to the ALJ at Step Four for a more detailed credibility determination, it cannot, at this time, assess whether substantial evidence in the record supports ALJ Arzt's findings at Step Five.

Jones contends that the Commissioner did not satisfy his burden at Step Five because the ALJ failed to (a) call a vocational expert to testify at the hearing and (b) identify specific jobs that Jones could perform.  (Pl.'s Mem. at 13-16).  According to Jones, the ALJ's reliance on the Grids at this step was reversible error.  (Id.).

At Step Five, the ALJ must assess the claimant's RFC and determine whether, based on the claimant's age, education, and work experience, the claimant could "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this analysis, the ALJ must determine whether there are jobs in the national economy that the claimant could perform.  SSR 83-10, 1983 WL 31251, at *4 (1983).  In an "ordinary case," when the claimant has only an exertional impairment,[28] the ALJ may meet this burden by applying the Medical-Vocational Guidelines, also known as the Grids.  Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); see also SSR 83-11, 1983 WL 31252, at *1 (1983) (use of Grids to direct conclusion of "disabled" or "not disabled" allowed only when criteria of a rule in the Grids are "exactly met").  When a claimant experiences both exertional and nonexertional limitations,[29] the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone.  Bapp, 802 F.2d at 605-07.  The ALJ must

---

[28]     "Exertional limitations" are "limitations and restrictions imposed by [a claimant's] impairment(s) and related symptoms" that affect his "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 404.1569a(b).

[29]     "Nonexertional limitations" include, inter alia, most mental impairments, such as depression, anxiety, and inability to concentrate.  20 C.F.R. § 404.1569a(c)(1); SSR 85-15, 1985 WL 56857, at *2 (1985).

instead rely on additional vocational resources, such as expert testimony, when a

claimant's nonexertional limitation "significantly diminish[es]" her work capacity

"beyond that caused by [her] exertional impairment."  Id. at 605 (the diminishment must

be more than negligible).  The ALJ must determine whether expert testimony is required

on a "case-by-case basis."  Id. at 605-06.  "[T]he mere existence of a nonexertional

impairment does not automatically require the production of a vocational expert nor

preclude reliance on the [Grids]."  Id. at 603.  In short, the ALJ may apply the Grids —

without calling a vocational expert — if they "adequately reflect a claimant's condition."

Id. at 605.

        Because a proper determination of Jones' credibility may impact the ALJ's

assessment of Jones' RFC and her nonexertional limitations at Step Four of the required

analysis, it would be premature to decide now whether there is other work that Jones can

perform.

        D.      Scope of Remand

        In her papers, Jones contends that because the ALJ failed to call a

vocational expert, and therefore "failed to identify other jobs that [she] might be capable

of performing," judgment should be entered in her favor, without remanding this case.

(See Pl.'s Mem. at 21-22 (citing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000))).

        Pursuant to the fourth sentence of 42 U.S.C. § 405(g), a district court

reviewing the Commissioner's final decision has the power "to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of

the [Commissioner], with or without remanding the cause for rehearing."  A remand

solely for the calculation of benefits, however, is an extraordinary remedy warranted only

when the record contains persuasive proof that a rehearing would serve no purpose.  See

Rivera v. Barnhart, 379 F. Supp. 2d 599, 605 (S.D.N.Y. 2005) (citing Rosa, 168 F.3d at

83); Martinez v. Barnhart, 262 F. Supp. 2d 40, 49 (W.D.N.Y. 2003) (citing Parker v.

Harris, 626 F.2d 225, 235 (2d Cir. 1980)).  Here, if the ALJ makes properly-supported

findings that Jones is capable of performing unskilled work, it is possible that Jones may

not be entitled to benefits.  In these circumstances, the award of a judgment in Jones'

favor would be improper.

V.      Conclusion

            For the foregoing reasons, the Commissioner's motion, (ECF No. 6), for

judgment on the pleadings should be denied, Jones' cross-motion, (ECF No. 8), should be

granted in part, and the case should be remanded to permit the ALJ to provide a more

detailed credibility determination at Step Four of the required analysis.  If the ALJ

reaches a different result at Step Four, she should also consider the impact, if any, that her

new findings have on her prior findings at Step Five of the analysis.

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

            The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Deborah A. Batts and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b).  Any requests for an extension of time for filing objections must be directed to

Judge Batts.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).


Dated:         New York, New York
               July 15, 2011

                                                   FRANK MAAS
                                          United States Magistrate Judge


Copies to:

Carolyn A. Kubitschek, Esq.
Lansner Kubitschek Schaffer & Zuccardy
325 Broadway, Suite 201
New York, New York 10007

Susan C. Branagan
Assistant United States Attorney
United States Attorney's Office
86 Chambers Street, Third Floor
New York, New York 10007